# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MEMORY INTEGRITY, LLC**, | Case No. 3:15-cv-00262-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **INTEL CORPORATION**, | |
| Defendant. | |

John Mansfield, MANSFIELDLAW, 121 SW Morrison Avenue, Suite 400, Portland, OR 97204; Jonathan Baker, Michael Saunders, and Gurtej Singh, FARNEY DANIELS, PC, 411 Borel Avenue, Suite 350, San Mateo, CA 94402. Of Attorneys for Plaintiff.

Renée E. Rothauge, MARKOWITZ HERBOLD, PC, 1211 SW Fifth Avenue, Suite 3000, Portland, OR 97204; Michael J. Summersgill, Jordan L. Hirsch, and Sarah Beigbeder Petty, WILMERHALE, LLP, 60 State Street, Boston, MA 02109. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In 2005, two sophisticated companies—Intel Corporation ("Intel") and Sanmina-SCI Corporation ("Sanmina")—entered into an agreement in which Intel agreed to disclose to Sanmina highly confidential information that Sanmina requested as part of its attempt to develop potentially lucrative technology that would be compatible with Intel products. In return for this information, Sanmina agreed never to sue Intel for patent infringement based on any of Intel's

PAGE 1 – OPINION AND ORDER

products that included any of the disclosed technologies. During Sanmina's development efforts, the U.S. Patent and Trademark Office granted to Sanmina several patents, but Sanmina failed to create any marketable products. Ultimately, Sanmina ended its research using Intel's disclosed information and sold its patents to Memory Integrity, LLC ("Memory Integrity"). In this lawsuit, Memory Integrity seeks to hold Intel liable for patent infringement, which Intel argues is prohibited by the covenant not to sue that Memory Integrity expressly assumed when it purchased Sanmina's patents.

Memory Integrity asserts infringement claims against Intel under five patents: U.S. Patent Nos. 7,103,636 (the "'636 patent"), 7,107,409 (the "'409 patent"), 7,296,121 (the "'121 patent"), 8,572, 206 (the "'206 patent"), and 8,898,254 (the "'254 patent"). These patents are all directed toward maintaining cache coherence in multiprocessor computer systems.[1] Based on the covenant not to sue that Intel negotiated with Memory Integrity's predecessor in interest, Sanmina, Intel asks the Court to grant summary judgment in favor of Intel on: (1) all Memory Integrity's infringement claims; (2) Intel's counterclaim for declaratory judgment; and (3) Intel's seventh affirmative defense. For the reasons discussed below, the Court grants Intel's motion.

---

[1] Cache coherence problems arise in multiprocessor computer systems in which the processors share a main memory. The main memory stores data needed or generated by the system, but each individual processor also uses its own smaller, faster "cache" memory to store copies of data upon which the processor regularly operates. When the data is stored in the processor's cache, the processor may change the data. The data is then saved back to the main memory after operations conclude. In the interim, changes to data in an individual cache may cause the master copy in the main memory to become "stale" or out-of-date, and multiple processors may be using different versions of the same data, leading to cache incoherence. Methods of maintaining cache coherence, such as those described by the patents-in-suit, ensure that processors have access to the most up-to-date copies of data and that the system does not generate inconsistent versions of data. *See Memory Integrity, LLC v. Intel Corp.*, 2016 WL 1122718, at *4 (D. Or. Mar. 22, 2016); *Comput. Cache Coherency Corp. v. Via Techs., Inc.*, 2008 WL 4369770, at *2 (N.D. Cal. Sept. 23, 2008).

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party will bear the burden of proof at trial, "the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In patent litigation, contractual defenses to patent infringement—such as a covenant not to sue or an implied license—are affirmative defenses that the defendant must prove. *See Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1461 (Fed. Cir. 1990), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) ("And where the moving party has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense."); *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986) ("As the alleged infringer, [the defendant] has the burden of showing the establishment of an implied license.").

The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec.*

PAGE 3 – OPINION AND ORDER

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks

omitted).

## BACKGROUND[2]

### A.  Sanmina's "Project Isis" and the Covenant Not to Sue

In the mid-2000s, Sanmina and one it its subsidiaries, Newisys, Inc. ("Newisys") tried to

develop a "node controller" chip capable of connecting multiple Intel processors together in a

multiprocessor computer system.[3] Sanmina called this development effort "Project Isis." In order

to make the chip compatible with Intel processors, Sanmina needed detailed confidential

information about how Intel's processors worked. This confidential information included

specifics about how Intel's processors maintain cache coherence in a multiprocessor system.

Intel agreed to provide Sanmina with the requested confidential information on the express

condition that Sanmina sign a covenant not to sue Intel based on Intel's use of any of the

disclosed technology.

Before finalizing the covenant not to sue and delivering its secret documents, Intel

negotiated several confidentiality agreements with Sanmina. On July 30, 2003, and August 23,

2003, Intel and Sanmina entered into two Corporate Non-Disclosure Agreements ("CNDAs"),

which require Sanmina and its successors to maintain the confidentiality of Intel's confidential,

proprietary, and trade secret information. Additionally, Intel and Samina entered into a

Restricted Use Non-Disclosure Agreement (the "RUNDA") on August 23, 2005. The RUNDA

---

[2] Because the parties assert that this case involves highly sensitive trade secrets, the Court limits its discussion of facts to the information included in the parties' redacted, publicly-filed briefs. In order to avoid disclosing potentially confidential information, the Court refers to Intel's cache coherence technologies only in broad terms.

[3] For ease of reference, the Court generally refers to Sanmina and Newisys collectively as "Sanmina."

requires Sanmina and its successors to keep a record of all individuals who were given access to

Intel's confidential information. According to the RUNDA, Intel's confidential information

would:

> remain confidential until it becomes: (a) rightfully in the public
> domain other than by breach of a duty to Intel; or (b) rightfully
> received from a third party without any limitation on disclosure; or
> (c) rightfully known to Recipient without any limitation on
> disclosure prior to its receipt from Intel; or (d) independently
> developed by Recipient's employees who have not had access to
> the Confidential Information, or guidance from those who have
> had access; or (e) generally made available to third parties by Intel
> without restriction on disclosure.[4]

Also on August 23, 2005, Intel and Sanmina entered into an agreement (the "Intel-

Sanmina Agreement" or "ISA") containing the covenant not to sue. The ISA primarily concerns

Intel's disclosure of "Common System Interface" or "CSI" technology.[5] The ISA provides that

Sanmina and its successors "shall not Assert[6] any CSI Patent Claim against Intel" based on

Intel's "manufacture, use, import, offer for sale or sale of any of [Intel's microprocessors and

chipsets]."[7] The ISA defines "CSI Patent Rights" as any rights that Sanmina or its successors

---

[4] Dkt. 171-4 ¶ 6. The CNDAs contain similar descriptions of when Sanmina's obligation of confidentiality would terminate. *See* Dkt. 171-2 ¶ 4; Dkt. 171-3 ¶ 4.

[5] According to Eric Morton, the lead Sanmina architect for Project Isis, "CSI was the bus interface and protocol that Intel was designing in 2005/2006 for their future processors." Dkt. 170-1 at 32. The ISA defines "CSI" as "an electro-mechanical point-to-point information path capable of carrying cache-coherence, I/O transactions, system related transactions, configuration management transactions, interrupts and/or other related transactions between an Intel microprocessor and [other components]." Dkt. 171-1 § 1.8. "CSI" was also referred to as "QuickPath Interconnect" or "QPI" after Intel publicly announced the processors. *See* Dkt. 170-1 at 36-37; Dkt. 181-7.

[6] The ISA defines "Assert" as "bring an action of any nature before any legal, judicial, arbitration, administrative, executive or other type of body or tribunal that has or claims to have authority to adjudicate such action in whole or in part." Dkt. 171-1 § 1.1.

[7] Dkt. 171-1 §§ 1.11, 2.1.

own or control "at any time during the Capture Period"[8] that "but for this Agreement, would be infringed by one or more of Intel's Products due in whole or in part to those products' inclusion or implementation of any portion of the CSI Enabling Information."[9] "CSI Enabling Information" is defined as "all information provided by Intel to [Sanmina] that is (a) necessary or useful in implementing CSI-enabled, CSI-compliant, or CSI-related technologies; and (but not 'or') (b) restricted by a duty of confidentiality, however arising and including that provided under the RUNDA."[10] The ISA also specifies that Delaware law governs the agreement's interpretation.[11]

On March 3, 2006, Sanmina and Intel entered into a Restricted Secret Non-Disclosure Agreement (the "RS-NDA") regarding Sanmina's duty to maintain the confidentiality of Intel's "Restricted Secret," or "RS," documents disclosed to Sanmina. Like the RUNDA, the RS-NDA provides:

> The obligations imposed by this RS-NDA shall not apply with respect to Restricted Secret information that is: (a) rightfully in the public domain other than by a breach of a duty to Intel; (b) rightfully received by [Sanmina] from a third party without any obligation of confidentiality; (c) rightfully known to [Sanmina] without any limitation on use or disclosure prior to its receipt from Intel; (d) independently developed by employees of [Sanmina]; or (e) generally made available to third parties by Intel without restriction on disclosure.[12]

---

[8] The "Capture Period" is "any time on or prior to the tenth anniversary of the Effective Date" of the ISA—*i.e.*, from August 23, 2005, to August 23, 2015. Dkt. 171-1 § 1.2.

[9] Dkt. 171-1 § 1.10.

[10] Dkt. 171-1 § 1.9.

[11] Dkt. 171-1 § 5.1.

[12] Dkt. 171-5 at 15.

After Sanmina signed the ISA and the several confidentiality agreements, Intel provided confidential information to Sanmina specifically describing Intel's implementation of cache coherence mechanisms used in Intel's processors. Sanmina's Project Isis team then held training sessions concerning Intel's processor architecture and cache coherence protocol. Sanmina also held biweekly telephone calls with Intel's engineers and received confidential RS documents from Intel. Intel and Sanmina each handled the RS documents with extreme care. Lead Sanmina architect Eric Morton testified that Intel provided personalized hard copies of the RS documents to the Project Isis team but did not give any Sanmina employees electronic copies of the documents; if the Sanmina employees wanted to view the documents electronically, they had to access the documents directly from Intel's servers. Further, Sanmina tracked precisely who had access to Intel's confidential documents and even housed the Project Isis team in a separate and secure wing at the Sanmina facilities.

Among the RS documents provided by Intel to Sanmina were: (1) "RS – Common System Interface Specification, Enterprise MP Systems" (the "CSI Specification");[13] (2) "RS – Thurley Platform Common System Interface (CSI) Training" (the "Thurley Document");[14] and (3) "RS – OEM Technical Training Beckton (BMP)" (the "Beckton Document").[15] These RS documents disclosed specific details about Intel's implementation of its cache coherence protocol.

---

[13] Dkt. 170-16 (Revision 0.90); Dkt. 170-17 (Revision 0.8, Part A); Dkt. 170-18 (Revision 0.8, Part B).

[14] Dkt. 170-15.

[15] Dkt. 170-14.

PAGE 7 – OPINION AND ORDER

**B.  The Patents-in-Suit**

Despite Intel's disclosure of its confidential information to Sanmina, Project Isis failed to yield marketable products. Sanmina ended the project in 2007. Based upon Sanmina and Newisys's work on solutions to the cache coherence problem, however, the U.S. Patent and Trademark Office issued five patents to Sanmina, its subsidiaries, or its successor in interest. Newisys filed applications for the '636, '409, and '121 patents on May 28, 2002, March 22, 2002, and October 15, 2004, respectively. The U.S. Patent and Trademark Office issued the '636, '409, and '121 patents on September 5, 2006, September 12, 2006, and November 13, 2007, respectively. Newisys assigned these three patents to Sanmina on September 28, 2008. On December 15, 2011, Sanmina filed an application for the '206 patent, but on June 4, 2013, before the '206 patent issued, Sanmina sold all its cache coherence patents to Memory Integrity. On September 9, 2013, Memory Integrity filed an application for the '254 patent, which is a continuation of the '206 patent. The U.S. Patent and Trademark Office issued the '206 and '254 patents to Memory Integrity on October 29, 2013, and November 25, 2014, respectively.

The five asserted patents share common inventors and have overlapping specifications. The patents all describe methods of maintaining cache coherence in the same type of multiprocessor system: a system of multiple processor clusters interconnected in a "point-to-point architecture."[16] The '636 and '409 patents detail a method known as "speculative probing." A processor's request for data in the multiprocessor system goes through a "serialization point," defined in the patents as "[a]ny mechanism for ordering data access requests."[17] Before a request

---

[16] Dkt. 170-3 at 27 ('636 patent at 20:55-63); Dkt. 170-4 at 25 ('409 patent at 18:5-14); Dkt. 170-5 at 43 ('121 patent at 31:23-27); Dkt. 170-6 at 24 ('206 patent at 20:57-59); Dkt. 170-7 at 23 ('254 patent at 18:37-39). Docket numbers are used only in the first citation to the patents-in-suit.

[17] '636 patent at 5:43-44; '409 patent at 4:65-66.

arrives at a serialization point, the system's cache coherence controller sends out "probes" to determine whether any cache memory locations have modified copies of the requested data.[18] According to the patents, sending speculative probes before a request reaches the serialization point increases the efficiency of the system.

Speculative probing helps ensure cache coherence, but may also generate excessive probe traffic if all remote or all local caches are probed regardless of whether they contain the requested data. The '636 patent is directed at speculative probing of "remote" processor clusters, *i.e.*, those that do not contain the processors requesting the data.[19] The '409 patent is directed at speculative probing of "local" processor clusters, *i.e.*, those that contain the processors requesting the data.[20]

The '121 patent describes a technique for further reducing probe traffic. The patent purports to reduce probe traffic by using a probe filtering unit ("PFU"). In the system claimed by the patent, the cache coherence controller receives a request for data and then sends a probe to the PFU. The PFU contains "probe filtering information," which allows the PFU to determine if the requested data is located in cache memory within the system.[21] If no cache memory contains the requested data, the PFU does not send any probes. If the PFU determines that a processor's cache may contain a copy of requested data, the PFU sends a probe to that cache alone.

The related '206 and '254 patents each describe a technique for purportedly increasing the speed of memory transactions. The patents describe a multiprocessor system that has both

---

[18] '636 patent at 6:16-18; '409 patent at 5:38-40.

[19] '636 patent at 3:3-7.

[20] '409 patent at 2:67-3:5.

[21] '121 patent at 2:67-3:1.

"local memory" and "remote memory."[22] Local memory is stored in the same cluster as a given processor, and remote memory is all memory located outside a given processor's cluster. "Protocol engines" process requests for local and remote memory.[23] The patents describe a way to improve the efficiency of memory transaction processing by dividing the processing workload among multiple protocol engines, according to whether the targeted memory is local or remote. This is analogous to using one-way streets to improve traffic flow and reduce congestion.

## C.  Memory Integrity's Infringement Contentions Against Intel

When Memory Integrity purchased the five patents-in-suit from Sanmina, Memory Integrity agreed to be bound by the covenant not to sue contained in the ISA. Memory Integrity expressly agreed "to be bound by, and to honor, all Existing Agreements" specified by Sanmina, including the covenant not to sue Intel.[24] Notwithstanding its agreement to be bound by the covenant not to sue, Memory Integrity sued Intel in the U.S. District Court for the District of Delaware on November 1, 2013. On February 13, 2015, the District Court in Delaware granted Intel's motion to transfer the case to the District of Oregon.

In its responses to Intel's requests for admission, Memory Integrity acknowledges that some of its infringement claims rest, at least in part, on cache coherence functionalities that Intel asserts it disclosed to Sanmina. In Response No. 2, "Memory Integrity admits that at least one Accused Product infringes the '636 patent in part because of its Source Snooping functionality as described in Memory Integrity's infringement contentions."[25] In Response No. 11, "Memory

---

[22] '206 patent at 7:32-38; '254 patent at 7:35-40.

[23] '206 patent at 1:48-67; '254 patent at 1:51-2:4.

[24] Dkt. 170-9 § 7.2; Dkt. 170-10 at 3-4.

[25] Dkt. 172-13 at 7.

Integrity admits that it contends that [an Accused Product] applies a hash algorithm to addresses to select particular Cache Boxes as described in Memory Integrity's infringement contentions."[26] And in Response No. 27, "Memory Integrity admits that it contends that [an Accused Product] infringes the '206 and '254 patents in part because of the manner in which the Cache Boxes process transactions from the Cores as described in Memory Integrity's infringement contentions."[27]

## DISCUSSION

In response to Intel's motion for summary judgment, Memory Integrity asserts that the ISA's covenant not to sue does not bar Memory Integrity's infringement claims against Intel. Memory Integrity makes several alternative arguments for this conclusion. Memory Integrity argues that the ISA is unenforceable due to its failure to include an essential term and also due to vagueness. Memory Integrity further argues that the ISA does not apply to the information purportedly disclosed by Intel to Sanmina because Intel has not shown that this information is "CSI Enabling Information." According to Memory Integrity, Intel has failed to establish that the information is CSI Enabling Information for two alternative reasons: (1) Intel has failed to present sufficient evidence to establish that the information was useful to Sanmina in implementing CSI-related technologies; and (2) the information was not "confidential" either at the time of disclosure or at the time Memory Integrity filed its lawsuit. Finally, Memory Integrity argues that Intel has failed to establish that Memory Integrity's infringement contentions are based on the information that Intel disclosed to Sanmina.[28]

---

[26] Dkt. 172-13 at 11.

[27] Dkt. 172-13 at 18.

[28] Memory Integrity concedes that Sanmina or its affiliates and successors owned or controlled the alleged CSI Patent Rights during the Capture Period.

## A.  Whether the ISA Is Enforceable

### 1.  General Principles of Contract Interpretation Under Delaware Law

In the ISA, the parties agree that Delaware law applies. Under Delaware law, "[t]he

proper construction of any contract, including an insurance contract, is purely a question of law."

*Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195

(Del. 1992). When a court interprets a contract, "the threshold inquiry when presented with a

contract dispute on a motion for summary judgment is whether the contract is ambiguous.

Ambiguity does not exist simply because the parties disagree about what the contract means."

*United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) (footnotes

omitted). Additionally, "[a] term is not ambiguous simply because it is not defined." *Sassano v.*

*CIBC World Markets Corp.*, 948 A.2d 453, 468 n.86 (Del. Ch. 2008). Ambiguity exists "only

when the provisions in controversy are reasonably or fairly susceptible of different

interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196.

A provision is not reasonably susceptible to different interpretations when one party's

interpretation "produces an absurd result or one that no reasonable person would have accepted

when entering the contract." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

When interpreting a contractual provision, courts "will give priority to the parties'

intentions as reflected in the four corners of the agreement." *GMG Capital Invs., LLC v.*

*Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). If a court finds that a provision

is ambiguous, however, "the interpreting court must look beyond the language of the contract to

ascertain the parties' intentions." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d

1228, 1232 (Del. 1997); *Cont'l Warranty, Inc. v. Warner*, 108 F. Supp. 3d 256, 260 (D.

Del. 2015) ("Delaware law requires 'uncertainty in the meaning and application of contract

language' before courts may consider extrinsic evidence." (quoting *Eagle Indus.*, 702 A.2d at

1232)). The court may accomplish this task "by the summary judgment procedure in certain cases where the moving party's record is not *prima facie* rebutted so as to create issues of material fact." *Eagle Indus.*, 702 A.2d at 1232-33.

Delaware follows the "objective" theory of contracts—meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party." *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007). To form a contract, the parties must manifest "mutual assent to the exchange and consideration," and "[o]vert manifestations of assent rather than subjective intent control contract formation." *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006). There is no mutual assent "when both parties unknowingly attach materially different meanings to a contract term." *Cont'l Warranty*, 108 F. Supp. 3d 250, 254 (D. Del. 2015). There must be "a complete meeting of the minds on all material terms" in order for a contract to be enforceable. *Ramone*, 2006 WL 905347, at *10; *see also Intellisource Grp., Inc. v. Williams*, 1999 WL 615114, at *4 (D. Del. Aug. 11, 1999) ("[T]here can be no contract when an essential term is missing."). A contract's material terms also must be sufficiently definite to be enforceable: "The material terms of a contract will be deemed fatally vague or indefinite if they fail to provide a reasonable standard for determining whether a breach has occurred and the appropriate remedy." *Indep. Cellular Tel., Inc. v. Barker*, 1997 WL 153816, at *4 (Del. Ch. Mar. 21, 1997).

### 2. Whether the ISA Failed to Include a Material or Essential Term

Memory Integrity argues that because the parties left the phrase "CSI Patent Claim" undefined in the ISA, the parties failed to include an essential term in their contract. This failure, argues Memory Integrity, renders the ISA unenforceable. To determine if the definition of "CSI Patent Claim" was a material or essential term, the Court must consider whether there is any evidence that either party "regard[ed] the agreement as incomplete and intend[ed] that no

obligation shall exist until other terms [were] assented to or until the whole ha[d] been reduced to another written form." *Intellisource*, 1999 WL 615114, at *5 (quoting *Restatement (Second) of Contracts* § 27 cmt. b (1981)). The Court must also consider whether "a reasonable person would conclude that the [missing term] would be an essential term in the purported contract at bar." *Id.* The Delaware Court of Chancery has further explained that the test for whether the parties agreed on all material or essential terms is:

> whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms *that the parties themselves regarded as essential* and thus that the agreement concluded the negotiations. . . .

*Pharmathene, Inc. v. SIGA Techs., Inc.*, 2010 WL 4813553, at *8 (Del. Ch. Nov. 23, 2010) (quoting *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 128 (Del. Ch. 2004), *aff'd*, 867 A.2d 903 (Del. 2005)) (emphasis in original) (alteration omitted).

The ISA states:

> Company [Sanmina] agrees that Company shall not Assert any CSI Patent Claim against Intel, its subsidiaries or affiliates, or their customers  (direct or indirect), distributors (direct or indirect), agents (direct or indirect) and contractors (direct or indirect) for the manufacture, use, import, offer for sale or sale of any of Intel's Products . . . .[29]

The ISA uses the term "CSI Patent Claim" only one other time. The ISA's "License Option" provision explains that if the covenant not to sue is terminated, Intel will have the option to receive a going-forward license to Sanmina's "CSI Patent Rights" and a corresponding release of "all damages and claims, worldwide, for all liability for asserted or unasserted CSI Patent Claims against Intel."[30]

---

[29] Dkt. 171-1 § 2.1.

[30] Dkt. 171-1 § 3.1.

Memory Integrity is correct that the ISA does not specifically define "CSI Patent Claim." "CSI Patent Claim" is a short phrase that consists of the word "CSI" followed by two other capitalized words, "Patent" and "Claim." The ISA defines "CSI," "CSI Enabling Information," and "CSI Patent Rights."[31] The ISA also defines "Assert."[32] In addition, the term "claim" has a common and ordinary meaning. *See Borish v. Britamco Underwriters, Inc.*, 869 F. Supp. 316, 319 (E.D. Pa. 1994) ("Courts give undefined contract terms their common meaning. The terms 'claim' and 'notice' are standard terms . . . ." (citation omitted)). In common usage, "claim" means "any right to payment or to an equitable remedy, even if contingent or provisional . . . . A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for." *Black's Law Dictionary* 301 (10th ed. 2014).[33]

The parties would have understood the common meaning of the term "claim" at the time of contracting. Notwithstanding the fact that the word "claim" is capitalized in "CSI Patent Claim," there is no evidence that the parties regarded the ISA as incomplete or otherwise intended that no obligations exist until a further agreement was reached. To the contrary, Intel's extensive disclosures of Restricted Secret documents and the extensive steps taken by Sanmina to maintain the confidentiality of those documents indicate that both parties understood that they had reached an agreement concerning the information that Intel conveyed. In light of these undisputed facts, the Court finds that there is no genuine dispute regarding whether a reasonable negotiator, in the parties' position when they negotiated the ISA, would have concluded that the

---

[31] Dkt. 171-1 §§ 1.8-1.10.

[32] Dkt. 171-1 § 1.1.

[33] The identical definition appears in *Black's Law Dictionary* 264 (8th ed. 2004), which is the year immediately before the parties used the word "claim" in the ISA.

ISA constituted an agreement to all terms that the parties themselves regarded as essential and that the agreement concluded the negotiations. Thus, the ISA's failure to define the term "CSI Patent Claim" does not render the agreement unenforceable.

### 3.  Whether the ISA Is Fatally Vague or Ambiguous

Memory Integrity also argues that the term "CSI Patent Claim" is susceptible to several different interpretations and that this ambiguity makes the ISA unenforceable. According to Memory Integrity, "CSI Patent Claim" could, for example, refer to a claim of a patent. Intel responds that "CSI Patent Claim" is susceptible to only one reasonable interpretation in the context of the ISA, and it means "the assertion of a legal claim based on a CSI Patent Right."[34]

The Court looks first to the intrinsic evidence, the ISA itself, to determine whether "CSI Patent Claim" is ambiguous. As discussed above, the ISA defines "CSI," which means "an electro-mechanical point-to-point information path capable of carrying cache-coherence, I/O transactions, system related transactions, configuration management transactions, interrupts and/or other related transactions between an Intel microprocessor and [other components]."[35] The ISA also defines "CSI Patent Rights" as:

> Company's Patent Rights that: (a) now or at any time during the Capture Period are owned or controlled by Company; and (b) but for this Agreement, would be infringed by one or more of Intel's Products due in whole or in part to those products' inclusion or implementation of any portion of the CSI Enabling Information.[36]

---

[34] Dkt. 198 at 22.

[35] Dkt. 171-1 § 1.8.

[36] Dkt. 171-1 § 1.10.

Additionally, the License Option in the ISA couples the terms "CSI Patent Rights" and "CSI Patent Claim," discussing a going-forward license of CSI Patent Rights that correspond to a past release of liability for CSI Patent Claims.

Memory Integrity points to unrelated agreements that Intel negotiated with unrelated parties as evidence that "CSI Patent Claim" could mean a "claim of a patent."[37] The context in which "CSI Patent Claims" appears in the ISA, however, precludes such a definition. The License Option discusses a release of liability for "CSI Patent Claims," establishing that the term refers only to a legal claim that could, absent the covenant not to sue, result in liability for Intel. Memory Integrity does not argue that the context of the ISA suggests any other alternative interpretation of the term as used in this particular agreement. In the context of the ISA, Memory Integrity's proposed alternative meaning is nonsensical.[38]

A lack of an express definition alone does not render a contract term ambiguous. *Sassano*, 948 A.2d at 468 n.86. Looking to the definition of "CSI," "CSI Patent Right," the common meaning of "claim," and the discussion in the License Option, the Court finds that "CSI Patent Claim" is unambiguous and susceptible only to one interpretation: a legal claim based on

---

[37] Dkt. 179 at 38.

[38] In the context of a motion to compel discovery, the District Court for the District of Columbia similarly addressed the relevance of contracts between one party and non-parties to the case. In denying the motion, the court emphasized, "These contracts were made between different contracting officers and different private contractors, at different times for different purposes." *United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 38 (D.D.C. 2012). The court further noted that the contract at issue "[was] not a form agreement" but rather "a massive, unique undertaking. [The defendant] has not explained how the contracts are sufficiently similar to make [the plaintiff's] interpretation of one binding on the other." *Id.* Likewise, in this case, Memory Integrity's submits contracts made by different contracting officers at different times for different purposes than the ISA without explaining how the contracts are sufficiently similar to make Intel's interpretation of one binding on the other.

CSI Patent Rights. Therefore, the Court finds that the ISA is not unenforceable due to vagueness.[39]

## B.  Whether the Disclosed Information Is CSI Enabling Information Under the ISA

The ISA defines "CSI Enabling Information" as "all information provided by Intel to [Sanmina] that is (a) necessary or useful in implementing CSI-enabled, CSI-compliant, or CSI-related technologies; and (but not 'or') (b) restricted by a duty of confidentiality, however arising and including that provided under the RUNDA."[40] Accordingly, to qualify as CSI Enabling Information, the information disclosed by Intel must have been both useful to Sanmina and confidential. Memory Integrity argues that any purportedly disclosed information fails both prongs of this test.

### 1.  Intel's Disclosure to Sanmina

As a threshold matter, Memory Integrity argues that Intel has failed to identify in its motion documents that disclosed some of the information Intel purports to have conveyed to Sanmina. Intel asserts that it disclosed implementation details of six different cache coherence technologies to Sanmina: (1) source snooping; (2) home snooping; (3) functionality for receiving a cache access request and sending a probe; (4) use of a particular hashing algorithm; (5) a caching agent (also known as a Cache Box) that processes transactions; and (6) snoop filtering. In its motion, Intel identifies three Restricted Secret documents that disclosed the way in which Intel implements these technologies: (1) the CSI Specification; (2) the Thurley Document; and (3) the Beckton Document.

---

[39] Because the Court finds that the parties did not understand an expressly agreed-upon definition of "CSI Patent Claim" to be an essential term and that the ISA is not fatally vague, the Court does not reach Intel's argument that Memory Integrity agreed that the ISA was enforceable by purchasing the patents and agreeing "to be bound by, and to honor" the covenant not to sue.

[40] Dkt. 171-1 § 1.9.

Other than the caching agent technology, the technological implementations that Intel purports to have disclosed to Sanmina or its subsidiary are undisputedly described in the three identified Restricted Secret documents. Section 8.5.1.1 of the CSI Specification describes Intel's source snooping protocol. Section 8.1.1 of the CSI Specification describes source snooping, home snooping, and snoop filtering. In his deposition, Mr. Morton also explains that a figure depicted in the Thurley Document illustrates the functionality for receiving cache access requests and sending probes. Further, the Beckton Document describes a hashing algorithm.

As for the technology related to a caching agent that processes transactions, Mr. Morton identifies the Beckton Document as the source of this information for Sanmina. He verifies that based on the Beckton Document, he understood that Intel's caching agent processes specific transactions. The questions posed to Mr. Morton are phrased slightly differently than Intel's description of caching agents in its brief, but nonetheless, the Beckton Document and Mr. Morton's testimony establish that Intel disclosed to Sanmina information regarding Intel's implementation of caching agents that can process specific transactions.

Memory Integrity argues that Mr. Morton's testimony is conclusory and that his understanding of the technologies may not embrace the technological descriptions set forth by Intel in its brief. Memory Integrity, however, offers no evidence that calls into question Mr. Morton's testimony, which the text of the Restricted Secret documents corroborates.[41] *See*

---

[41] Memory Integrity's expert witness, Dr. Matthew Farrens, asserts that Intel did not disclose a specific implementation regarding receiving requests and sending probes. *See* Dkt. 180 ¶ 20. But Dr. Farrens does not dispute that Intel disclosed its use of a functionality for receiving requests and sending probes or that Intel disclosed the Thurley Document. *See id.* ¶¶ 21-22. He asserts only that this more general information was publicly known. Dr. Farrens also mistakenly claims that Mr. Morton does not mention probes in the context of the Thurley Document. *See* Dkt. 170-1 at 59-63. Additionally, Dr. Farrens asserts that Intel's disclosure of a caching agent technology "would not have been earlier than August 16, 2016." *Id.* ¶ 34. It appears from the

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) ("[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" (quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2529, at 300 (2d ed. 1995));[42] Edward J. Brunet *et al.*, *Summary Judgment – Federal Law and Practice* § 8.11, at 345 (2014) ("If the expert's testimony will be unopposed at trial, nothing is accomplished by allowing the case to be tried when a party is unable to obtain an affidavit to rebut an expert's testimony."). Therefore, there is no genuine issue of material fact concerning whether Intel disclosed its implementation of the six cache coherence technologies it describes.

### 2. Usefulness to Sanmina

Memory Integrity argues that even if Intel disclosed how it implements the six technologies in question, Intel has failed to show that the information is CSI Enabling Information. According to Memory Integrity, Intel has not offered evidence of how or why the information proved useful for implementing CSI-related technologies. Intel responds that Memory Integrity's argument conflicts with the testimony of Mr. Morton, who both led the Project Isis team at Sanmina and served as one of the named inventors for the '121 patent (concerning a probe filtering unit). According to Intel, Memory Integrity had the opportunity fully to examine Mr. Morton at his deposition on how or why Intel's disclosures were useful and

context of this statement, however, that Dr. Farrens meant "earlier than August 16, 2006," which Memory Integrity confirmed at oral argument on April 8, 2016.

[42] Although *Reeves* involved a motion for judgment as a matter of law and was not a summary judgment decision, the Supreme Court stressed that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" 530 U.S. at 150 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-251 (1986)).

cannot now persuasively argue that his explanations are simply conclusory or otherwise insufficient.

With its motion, Intel offers extensive testimony from Mr. Morton concerning the usefulness of the information Intel disclosed to Sanmina. Memory Integrity does not dispute that Mr. Morton has personal knowledge of whether Intel's disclosures proved useful to Sanmina in developing CSI-related technologies. According to Mr. Morton, as the lead architect for Project Isis, he was responsible for understanding CSI (or "QPI") and Intel's architecture and designing and verifying a protocol that Sanmina's node controller chip would use to maintain cache coherence while also maintaining the requirements of Intel's architecture. He explains how and why Intel's source snooping technology proved useful to Sanmina, stating that the only way to understand Intel's source snooping protocol was through Intel's disclosures to Sanmina. Although Mr. Morton does not provide the specifics of how and why the other five technological implementations disclosed by Intel were useful to Sanmina, he does definitively state that those disclosures were indeed useful as well.

Additionally, the text of the ISA supports Mr. Morton's testimony. The ISA included certain milestones that Intel had to meet. Among other things, the ISA required Intel to deliver the CSI Specification within 60 days of the agreement's effective date. This requirement corroborates Mr. Morton's testimony that Sanmina considered the information in the CSI Specification about source snooping, home snooping, and snoop filtering useful.

When evidence is "one-sided" on a factual matter, a court may decide the issue as a matter of law on summary judgment. *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993). A party's "completely insupportable, specious, or conflicting explanations or excuses will not suffice to raise a *genuine* issue of fact." *Id.* (emphasis in

original). Here, Memory Integrity has presented no evidence that contradicts either Mr. Morton's testimony on this issue or the ISA's implicit indication that Sanmina considered the information in Intel's CSI Specification essential to Project Isis.

Memory Integrity's criticisms of Mr. Morton's testimony, particularly in light of Memory Integrity's failure to present the Court with any contrary evidence (including any other portions of Mr. Morton's testimony), does not create a genuine issue of material fact. *See, e.g.*, *Processed Plastics Co. v. United States*, 473 F.3d 1164, 1170 (Fed. Cir. 2006) ("[T]he nonmovant 'must point to an evidentiary conflict created on the record at least by a counter statement of fact or facts set forth in detail.'" (quoting *Barmag Barmer Maschinenfabrik AG. v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984)); *Am. States Ins. Co. v. Sacramento Plating, Inc.*, 861 F. Supp. 964, 969 n.5 (E.D. Cal. 1994), *aff'd*, 99 F.3d 1145 (9th Cir. 1996) (overruling a non-moving party's objection to an expert's deposition when the party "had the opportunity to cross-examine [the expert] on both his qualifications and the methods used to reach his opinion, but chose not to provide the court with any portions of the deposition which would call [the same] into question"); *Pac. Gas & Elec. Co. v. Howard P. Foley Co.*, 1993 WL 299219, at *7 (N.D. Cal. July 27, 1993) ("[I]t is unfair for Defendants to claim that [an expert's] declaration . . . is unsupported by his deposition testimony when Defendants failed to fully develop his background themselves."). Accordingly, the Court finds that Intel has established that the information it disclosed proved useful to Sanmina in developing CSI-related technologies.

### 3. Confidentiality

Memory Integrity also argues that the disclosed information does not qualify as CSI Enabling Information because at the time Intel disclosed the information, it was widely known in the industry and therefore not confidential. Alternatively, Memory Integrity argues that the disclosures do not qualify as CSI Enabling Information because the information *later* became

PAGE 22 – OPINION AND ORDER

widely known and thus no longer confidential before Memory Integrity filed this lawsuit. In support of these arguments, Memory Integrity cites to presentations, articles, textbooks, Intel's patents and patent applications, and the declaration of Memory Integrity's expert, Dr. Farrens. Intel first responds that the testimony provided both by Intel's representative, Pamela Hays, and also by Mr. Morton establish that the disclosed information was highly confidential and subject to a strict duty of confidentiality at the time it was disclosed to Sanmina. Intel next argues that regardless of whether the disclosed information *later* may have become publicly known, which Intel disputes, the covenant not to sue applies so long as the information was confidential ***at the time*** of disclosure to Sanmina. Intel further argues that even if the covenant not to sue does not apply to information that later becomes known in the industry, Intel's evidence shows that the specific implementations that Intel disclosed to Sanmina have remained confidential to the present day.

### a. Confidentiality at the Time Intel Disclosed the Information to Sanmina

Ms. Hays is Intel's corporate designee in this case, and she was involved in negotiating the ISA with Sanmina. In her declaration, she states that the Restricted Secret documents disclosed to Sanmina required a strict duty of confidentiality because they reveal some of Intel's most sensitive technical information. These documents describe how Intel's microprocessors, which are Intel's core products, function. The first page of the documents includes a "Restricted Secret" label, and the documents' titles show the letters "RS," signifying that they contain particularly sensitive information. According to Ms. Hays, the implementation detail in these documents represents the "crown jewels" of Intel's trade secrets.[43]

---

[43] Dkt. 191-1 at 17.

Similarly, in his deposition, Mr. Morton repeatedly states that he regarded the information that Intel disclosed to Sanmina as confidential. He testifies that Sanmina kept the information that it received from Intel confidential and that he does not know of anyone from Sanmina who violated a duty of confidentiality with respect to the materials received from Intel. Additionally, Mr. Morton describes how Sanmina personalized Intel's documents for each team member so that the documents could be better controlled and tracked. According to Mr. Morton, Sanmina also physically isolated the Project Isis team in a separate and secured wing at the Sanmina facilities.

These undisputed circumstances surrounding Intel's disclosures further confirm that the information given to Sanmina was confidential at the time of disclosure and was understood and treated by the parties as such. In order to develop a node controller that would work with Intel processors, Sanmina undertook years of negotiations with Intel to gain access to secret information about Intel's cache coherence protocol. Sanmina signed four separate confidentiality agreements, in addition to a covenant not to sue, in exchange for access to this information. If the information were public knowledge at the time or otherwise already known to Sanmina, Sanmina would have had no need to go through such a burdensome process to learn how Intel's processors maintain cache coherence. Nor would Sanmina have needed to go to such lengths— including keeping track of who accessed Intel's documents and physically isolating the Project Isis team from other Sanmina employees—to honor its confidentiality duties to Intel.

Memory Integrity presents an array of citations to documents that purportedly disclosed Intel's cache coherence technologies to the public before Intel disclosed the information to Sanmina. Memory Integrity's citations, however, only demonstrate that the general concepts at issue were known in the industry and show nothing about the specific proprietary

PAGE 24 – OPINION AND ORDER

implementations that Intel disclosed. An apt analogy is the difference between a restaurant's menu and its trade secret recipes. For example, a menu may list bucatini al savor di noci as a pasta course, and may even list its key ingredients. When the dish arrives at the table, a customer may taste walnuts, honey, ginger, black pepper, and lemon, in an olive oil base. This is all publicly available information. But the specific recipe needed to make this dish well would not necessarily be public knowledge. So, too, here; the general concepts of source snooping and other cache coherence technologies were known in the industry, but the specifics of how Intel implemented those technologies were not.

### b.  Confidentiality after the Disclosures Were Made

Memory Integrity also offers citations to documents that purportedly disclosed Intel's cache coherence technologies to the public after the disclosures to Sanmina were made but before Memory Integrity filed this lawsuit. According to Memory Integrity, the two CNDAs, the RUNDA, and the RS-NDA all specify that the duty of confidentiality under the agreements no longer applies if, among other things, the disclosed information becomes rightfully in the public domain or Intel generally makes the information available to third parties without restrictions on disclosure.

Intel responds first that the ISA does not require that disclosed information *remain* confidential after disclosure in order for the covenant not to sue to continue to apply. The Court again applies Delaware contract law to determine if the terms of the ISA are ambiguous. According to the ISA, CSI Enabling Information includes "all information provided by Intel to Company that *is* . . . restricted by a duty of confidentiality, however arising . . . ."[44] Memory Integrity argues that use of the present tense "is" means that the covenant not to sue applies only

_____

[44] Dkt. 171-1 § 1.9 (emphasis added).

if the disclosed information *remains* confidential at the time of the proposed assertion of a patent infringement claim or the invocation of the covenant not to sue as a defense. Intel responds that "is" refers to the circumstances that existed *at the time* Intel agreed to disclose the information to Sanmina, and therefore, the covenant not to sue applies so long as the disclosed information was restricted by a duty of confidentiality at the time of disclosure.

As required by Delaware law and discussed above, the Court begins its analysis with intrinsic evidence, the contract itself, to determine if the ISA is ambiguous. The ISA uses the present tense verb "is" to describe the confidentiality requirements for CSI Enabling Information. Although the Court is unaware of any Delaware court addressing what "is" means in a contract, the Delaware Court of Chancery has found that using the present tense of a verb can be evidence that a contract refers to the state of affairs at the time of contracting rather than at some future event. *See Winshall v. Viacom Int'l Inc.*, 2012 WL 6200271, at *6 (Del. Ch. Dec. 12, 2012). In addition, New York courts have addressed the precise issue of the temporal scope of "is." For example, in *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 361 F. Supp. 2d 210, 215 (S.D.N.Y. 2005), the court found that a contract's use of the word "is" established that the agreement did not transfer rights to patents acquired *after* the agreement's execution. The Fifth Circuit, however, notes, "[T]he present tense of a verb may sometimes refer to the past and to the future as well as to the present. . . . [T]he present tense may be used when the time is actually indefinite." *In re Stratford of Tex., Inc.*, 635 F.2d 365, 369 (5th Cir. Jan. 1981).

Moreover, even the cases finding that, in the context of a specific document, the use of the present tense is not forward-looking suggest that the *context* containing the present-tense verb should guide the interpretation. In *Winshall*, the Delaware court noted both that the contract used the present tense of verbs and that the contract referred to "current use." 2012 WL 6200271,

PAGE 26 – OPINION AND ORDER

at *6. In *Aspex Eyewear*, the court explained that the contract's lack of "any language that could in any way be construed as granting, or indicating an intention to grant, any future acquired rights" confirmed that "is" did not include future time. 361 F. Supp. 2d at 215. *The Cambridge Grammar of the English Language* similarly emphasizes that "temporal expressions" accompanying present-tense verbs indicate whether the present tense includes "future time situations." Rodney Huddleston & Geoffrey Pullum, *The Cambridge Grammar of the English Language* 131-32 (2002). For example, the sentence "She <u>is</u> president until next May" expressly includes a future time reference. *Id.* at 131 (emphasis in original).

Here, the ISA contains no relevant future time references. Similar to the facts in *Aspex Eyewear*, the ISA contains no language indicating that future occurrences affect whether disclosed information remains CSI Enabling Information. Additionally, the ISA states that the CSI Information "is . . . restricted by a duty of confidentiality, ***however arising*** . . . ."[45] This statement indicates that confidentiality should be broadly construed when determining whether information qualifies as CSI Enabling Information. The statement also indicates that information is CSI Enabling Information no matter when or how a duty of confidentiality arises. Thus, if disclosed information is confidential, it is "restricted by a duty of confidentiality" sufficient to satisfy the definition of "CSI Enabling Information," even if it later is no longer confidential.

Additionally, the covenant not to sue states that it "survive[s] termination or expiration of this Agreement" unless Intel fails to meet one of the listed milestones or the parties mutually agree to terminate the covenant.[46] Tellingly, the agreement does not state the covenant not to sue can otherwise become inapplicable based on disclosed and previously-confidential information

---

[45] Dkt. 171-1 § 1.9 (emphasis added).

[46] Dkt. 171-1 § 2.1.

later becoming publicly known. The Court therefore finds that the ISA is unambiguous and that CSI Enabling Information includes information that was confidential at the time of disclosure to Sanmina, regardless of whether it later may lose its confidential status.

Further, even if the ISA were ambiguous concerning the temporal scope of the duty of confidentiality and its relationship to the covenant not to sue, the undisputed extrinsic evidence presented by the parties would yield the same result. *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) ("After examining the relevant extrinsic evidence, 'a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation.'" (quoting *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *10 (Del. Ch. June 6, 1996) (alteration in original)); *Zimmerman v. Crothall*, 62 A.3d 676, 690-91 (Del. Ch. 2013) ("When construing an ambiguous contract, such as the one at issue here, the court will consider all relevant objective evidence, including: overt statements and acts of the parties, the business context, prior dealings between the parties, and business customs and usage in the industry." (footnotes omitted)).

Intel and Sanmina negotiated four other agreements that constitute relevant extrinsic evidence. The CNDAs discuss when confidential information will cease to be confidential for purposes of Sanmina's liability for disclosure. The CNDAs say nothing, however, regarding termination of the covenant not to sue or what constitutes CSI Enabling Information. Similarly, the RUNDA and RS-NDA discuss confidentiality in the context of Sanmina's rights to use and obligations to protect the disclosed information. The RUNDA and RS-NDA give no indication that they affect the covenant not to sue or what is CSI Enabling Information.

Further, Intel negotiated similar covenants not to sue with other companies. None of the agreements allow the other company to sue Intel based on disclosed information if the

previously-confidential information later becomes publicly known. Almost all of the agreements contain precisely the same text that CSI Enabling Information "is" restricted by a duty of confidentiality. It is not reasonable to conclude that Intel could have meant for all these agreements to subject it to patent infringement liability if others in the industry later independently learn the specifics of Intel's cache coherence protocol. The additional agreements that Intel negotiated with Sanmina and other companies and the lack of any contrary evidence presented by Memory Integrity establish that there is no genuine issue of material fact regarding whether the parties intended CSI Enabling Information to exclude information that later may become generally known in the industry.

Additionally, even if the ISA remained ambiguous after considering extrinsic evidence, principles of Delaware contract law would require the court to construe the provisions at issue in Intel's favor. A Delaware court has explained:

> "Where the language of an agreement is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that the contract is fairly susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract."

*Holland v. Nat'l Auto. Fibres*, 22 Del. Ch. 99, 106-07 (1937) (quoting *A. Leschen & Sons Rope Co. v. Mayflower Gold Mining & Reduction Co.*, 173 F. 855, 857 (8th Cir. 1909)) (cited with approval in *Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 591 (8th Cir. 2007) and *Katell v. Morgan Stanley Grp., Inc.*, 1993 WL 205033, at *4-5 (Del. Ch. June 8, 1993)).

The only reasonable interpretation of the covenant not to sue contained in the ISA is that the parties intended it to protect Intel from allegations of patent infringement based on Intel's use

of the disclosed information in its products. In exchange, Sanmina received highly confidential information that gave Sanmina the opportunity to develop its own potentially profitable products. Memory Integrity's interpretation of the ISA would massively decrease the protection for which Intel bargained. For example, Memory Integrity's interpretation would allow for patent infringement suits against Intel if through no fault of Intel's—such as the independent development of cache coherence technologies by another company—the industry learned the specifics of the cache coherence protocol used by Intel. Under Delaware law, the Court must prefer the construction that avoids an inequitable, unusual result. The principles of construction under Delaware contract law confirm that CSI information that was confidential at the time of disclosure qualifies as CSI Enabling Information subject to the ISA's covenant not to sue.

Finally, even if the Court were to accept Memory Integrity's interpretation, the undisputed extrinsic evidence establishes that the specifics of Intel's cache coherence technologies remain confidential to this day. Although Dr. Farrens points to public documents that purportedly disclose the information Intel gave to Sanmina, none of the documents explain *precisely* how Intel implements its specific cache coherence protocol in Intel processors. As discussed above, the documents cited by Dr. Farrens disclose the menu, whereas the information Intel gave to Sanmina discloses the secret recipe. Ms. Hays confirms that the implementation details given to Sanmina remain highly confidential. Memory Integrity has not offered any testimony or other evidence that conflicts with Ms. Hays's statements that Intel's specific implementations of cache coherence functionalities are still unknown to the industry. *See Reeves*, 530 U.S. at 151. Thus, under any interpretation of the ISA, Memory Integrity has failed to raise a genuine issue of material fact regarding whether the information disclosed to Sanmina constitutes CSI Enabling Information triggering the covenant not to sue.

## C.  Whether Memory Integrity's Infringement Contentions Are Based, at Least in Part, on the Disclosed Information

Memory Integrity argues that there is insufficient evidence that, "but for" the ISA, Intel's Accused Products would infringe the patents-in-suit "due in whole or in part to those products' inclusion or implementation of any portion of the CSI Enabling Information."[47] Intel responds that Memory Integrity's argument conflicts with Memory Integrity's own binding discovery admissions and infringement contentions.

As with other written instruments such as contracts, patents are interpreted and construed as a matter of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ("It follows, therefore, from the general rule applicable to written instruments that a patent is uniquely suited for having its meaning and scope determined entirely by a court as a matter of law."). As the Supreme Court has explained:

> With regard to the second part of this objection, that which claims for the jury the construction of the patent, we remark that the patent itself must be taken as evidence of its meaning; that, like other written instruments, it must be interpreted as a whole, its various provisions be taken as far as practicable in connection with each other, and the legal deductions drawn therefrom must be conformable with the scope and purpose of the entire document. This construction and these deductions we hold to be within the exclusive province of the court.

*Brown v. Huger*, 62 U.S. 305, 318 (1858) (cited with approval in *Markman*, 517 U.S. at 383 n.8). Accordingly, in patent cases, summary judgment is appropriate when the only real dispute between the parties concerns the proper meaning of a patent claim. *See Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1278 (Fed. Cir. 1995). In contrast, whether an accused product performs the function recited by a patent claim is usually a question for the trier-of-fact. *See DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354, 1368 (Fed. Cir. 1999).

---

[47] Dkt. 171-1 § 1.10.

Here, Memory Integrity's own binding discovery admissions acknowledge that its infringement contentions are based in part on three of the implementations that Intel disclosed to Sanmina. In Response Nos. 2, 11, and 27, Memory Integrity admits that it bases its contentions in part on the Accused Products' use of source snooping, hashing algorithm functionality, and Cache Box or caching agent functionality. Under the Federal Rules of Civil Procedure, matters admitted in response to requests for admission are deemed "conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). Memory Integrity has not made any such motion to withdraw or amend its admissions. Therefore, Memory Integrity's admissions conclusively establish that its infringement contentions are based, at least in part, on the Accused Products' use of source snooping,[48] hashing algorithm functionality, and Cache Box or caching agent functionality.[49]

Memory Integrity's infringement contentions also establish that Memory Integrity's infringement claims arise from functionalities disclosed to Sanmina. Memory Integrity's March 16 and December 15, 2015 infringement contentions accuse Intel of infringing based, in

---

[48] Memory Integrity initially accused Intel's products of infringing the '636 patent based in part on the Accused Products' use of source snooping. *See* Ex. D-2 to Memory Integrity's March 16, 2015 Infringement Contentions for the '636 patent, Dkt. 172-1 at 6-7. Memory Integrity, however, later dropped this infringement contention. *See* Memory Integrity's December 15, 2015 Infringement Contentions, Cover Pleading, Dkt. 172-12 at 3.

[49] Memory Integrity argues that it admitted only that its infringement contentions are based on general, non-confidential concepts embraced by Intel's disclosures to Sanmina. Memory Integrity cannot dispute, however, that infringement contentions necessarily rest on specific implementations of technology rather than broad, well-known technological concepts. When a plaintiff accuses specific products of infringing, "the evidence uncovered by the patent holder's investigation must be sufficient to permit a reasonable inference that all the accused products infringe." *Antonious v. Spalding & Evenflo Cos., Inc.*, 275 F.3d 1066, 1075 (Fed. Cir. 2002).

part, on the Accused Products' use of home snooping,[50] functionality involving receiving a cache

access request and sending a probe,[51] a hashing algorithm for determining where to direct

memory transactions for processing,[52] Cache Boxes or cache agents that process transactions in a

particular way,[53] and snoop filtering.[54] The descriptions of home snooping and snoop filtering in

Memory Integrity's infringement contentions tracks the descriptions of Intel's home snooping

and snoop filtering implementations in the CSI Specification.[55] Memory Integrity's infringement

contentions also describe a functionality for receiving a cache access request and sending a probe

that closely resembles the Thurley Document's explanation of this functionality.[56] Similarly,

Memory Integrity's infringement contentions describe a proprietary hashing algorithm and

caching agent functionality like the implementations that Intel disclosed to Sanmina in the

---

[50] Ex. D-3 to Memory Integrity's March 16, 2015 Infringement Contentions for the '636 patent, Dkt. 172-2 at 7; Ex. D-3 to Memory Integrity's December 15, 2015 Infringement Contentions for the '636 patent, Dkt. 172-7 at 7-8.

[51] Ex. B-2 to Memory Integrity's March 16, 2015 Infringement Contentions for the '409 patent, Dkt. 172-3 at 2; Ex. B-2 to Memory Integrity's December 15, 2015 Infringement Contentions for the '409 patent, Dkt. 172-8 at 2.

[52] Ex. C-2 to Memory Integrity's March 16, 2015 Infringement Contentions for the '206 patent, Dkt. 172-4 at 9; Ex. E-2 to Memory Integrity's March 16, 2015 Infringement Contentions for the '254 patent, Dkt. 172-5 at 2; Ex. C-2 to Memory Integrity's December 15, 2015 Infringement Contentions for the '206 patent, Dkt. 172-9 at 9-10; Ex. E-2 to Memory Integrity's December 15, 2015 Infringement Contentions for the '254 patent, Dkt. 172-10 at 2-4, 8, 14, 16.

[53] Ex. C-2 to Memory Integrity's March 16, 2015 Infringement Contentions for the '206 patent, Dkt. 172-4 at 2; Ex. C-2 to Memory Integrity's December 15, 2015 Infringement Contentions for the '206 patent, Dkt. 172-9 at 2.

[54] Ex. A-1 to Memory Integrity's March 16, 2015 Infringement Contentions for the '121 patent, Dkt. 172-6 at 2; Exhibit A-1 to Memory Integrity's December 15, 2015 Infringement Contentions for the '121 patent, Dkt. 172-11 at 2.

[55] *See* Dkt. 170-16 at 21.

[56] *See* Dkt. 170-15 at 3.

Beckton Document.[57] Mr. Morton confirms that the CSI Specification, Thurley Document, and Beckton Document gave Sanmina information about functionalities that are nearly identical to the accused instrumentalities.

Memory Integrity does not offer any contrary evidence. Rather, Memory Integrity argues that Intel has failed to show that Memory Integrity's infringement contentions rely on "the same" technologies allegedly disclosed to Sanmina (or Newisys).[58] For the reasons discussed above, however, the undisputed evidence establishes that Intel disclosed its specific implementations of cache coherence functionality to Sanmina and that Memory Integrity's infringement contentions rest, at least in part, on those disclosed functionalities.

Finally, Memory Integrity argues that Intel has failed to show that the Accused Products infringe *only* because they include technologies disclosed to Sanmina.[59] This is not, however, a requirement of the ISA. Again, the Court looks to the intrinsic evidence to determine whether the ISA is ambiguous. The agreement states that a CSI Patent Right is a patent right that "but for this Agreement, would be infringed by one or more of Intel's products due in whole *or in part* to those products' inclusion or implementation" of cache coherence technologies disclosed to Sanmina.[60] The ISA is unambiguous. Even if Intel's Accused Products might infringe the patents-in-suit in the absence of the cache coherence functionalities disclosed to Sanmina, the

---

[57] *See* Dkt. 170-14 at 3.

[58] Memory Integrity's Redacted Response Brief, Dkt. 199 at 14 n.3, 17.

[59] Memory Integrity's Redacted Response Brief, Dkt. 199 at 17 (". . . Intel has not presented evidence excluding that the products would still infringe *without* the implementation or inclusion of the technologies allegedly disclosed to Newisys.") (emphasis in original).

[60] Dkt. 171-1 § 1.10 (emphasis added).

Accused Products still *would* infringe *in part* because the products include the disclosed functionalities. This is enough to trigger the covenant not to sue based on CSI Patent Rights.

The ISA's covenant not to sue prohibits Memory Integrity from asserting any CSI Patent Claim, which is a legal claim based on CSI Patent Rights. CSI Patent Rights are any rights that would be infringed due to an Intel product's inclusion of CSI Enabling Information. Under the ISA, CSI Enabling Information is any information that is, among other things, useful in implementing CSI-related technologies and restricted by a duty of confidentiality. The undisputed evidence establishes that Intel disclosed CSI Enabling Information to Sanmina at Sanmina's request because the disclosed information would be useful to Sanmina in implementing CSI-related technologies and this information was restricted by a duty of confidentiality at the time of disclosure. Moreover, although the covenant not to sue, as contained in the ISA, does not require that CSI Enabling Information remain confidential after disclosure to Sanmina, the CSI Enabling Information actually disclosed by Intel to Sanmina has remained confidential, as of the time that Intel filed its motion. As shown by Memory Integrity's admissions and infringement contentions, Memory Integrity's claims of patent infringement are based, at least in part, on this CSI Enabling Information. Accordingly, the ISA's covenant not to sue bars Memory Integrity's patent infringement claims. No reasonable trier of fact could find otherwise, and summary judgment is appropriate.

## CONCLUSION

Intel's Motion for Summary Judgment (Dkt. 170) is GRANTED.

**IT IS SO ORDERED**.

DATED this 12th day of April, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge